THE STATE OF VERMONT *v.* PATRICK DENNIN.

*Criminal law.    Evidence.*

In an indictment under the 4th section of chap. 104, page 545 of the Compiled Statutes,* it is not necessary to a conviction that any portion of the building should be actually burned. It is sufficient if fire be applied to or in imme- diate contact with the building, with the intent to burn it, though such intent be not carried out.

On the trial of an indictment for a crime, the respondent, to weaken the force of the evidence of certain witnesses who had testified to his identity with the criminal, introduced evidence tending to show that at a preliminary examination of the respondent they testified less positively on that point; but it also appeared that the same witnesses, directly after the commission

* Which provides that "if any person shall wilfully and maliciously set fire, with intent to burn, to the dwelling house, etc., etc., of another, * * * he shall be punished, etc., etc."

of the offence, asserted positively the identity of the respondent with the person whom they saw commit the offence, and at the same time caused his arrest; *Held*, that such statements and action on the part of the witnesses, so near the time of the commission of the offence, tended to corroborate their testimony as to identity.

INDICTMENT under the fourth section of chapter 104, Comp. Stat., for setting fire to a barn with intent to burn the same. Plea, not guilty, and trial by jury, at the March Term, 1858, in Rutland county,—ALDIS, J., presiding.

To sustain the indictment the State produced one Campbell as a witness, who testified that he had charge of the barn in question; that in the evening of the 8th of May, 1857, he saw the respondent pass through the driveway to the barn, and go behind a large wagon under the shed, come out from behind the wagon and pass into the barn; that he then thought it was the respondent, and that he (the respondent) was going into the barn to commit a nuisance; that the witness who was then standing a short distance from the front door of the barn, went to the door and shut it in a minute or two after he saw the respondent go in, so the respondent could not get out of that door; that he then returned to where he had been standing, and again in a minute or two came back and opened the door, and with a lantern went into the barn, expecting to find the respondent and intending to reprimand him for using the barn for the purpose for which he supposed he had entered it; that he went in and passed from the door to the further end of the barn and then back to the door, but could not see any one in the barn below; that observing a side door (on the south side of the barn) near the stairs to be open he shut it, and then went to work at the front end of the barn; that in about a minute and a half or two minutes he heard the side door of the barn rattle, and as it could be opened only from the inside, and as the witness supposed that the respondent had stepped out at that door and was trying to get in, he went there to let him in; that upon getting to the foot of the stairs near the side door, he saw a light in the hay loft and that the side door was open, that a fire was blazing in the hay and straw near the head of the stairs; that the witness ran up stairs and extinguished the flames which were two or three feet high, and then ran back to the front door and called to one Bryant to come and

put out what was left of the fire, while he went out at the side door to look for the person who he supposed had set the fire, but on going out at that door into the back yard he was unable to see or find any one there ; that the witness was well acquainted with the respondent and was positive that it was the respondent he saw pass into the barn; that he saw no other person go into the barn, knew of no other person's being in the barn, and did not see any one come out of the barn after the respondent went in.

The State also produced one Bryant as a witness, who testified that he was sitting in the driveway to this barn and saw the respondent come into the driveway ; that the respondent was going towards the door of the barn, that he passed within eight feet of the witness and went behind a large wagon under the shed ; that the witness saw no more of him ; that in about five minutes afterwards, the hostler, Campbell, called to him and said that the barn was on fire; that the witness, Bryant, went into the barn and up stairs and put out the fire that was in the hay on the floor ; that he was well acquainted with the respondent and was positive that it was the respondent he saw go behind the wagon, and that he saw his face.

On the part of the defence evidence was introduced tending to show that Bryant and Campbell, when examined before the justice, at the time the respondent was bound over for trial, did not swear so positively that the person they saw go behind the wagon and into the barn was the respondent, as they did upon this trial; and particularly that Bryant said at the preliminary examination that he did not see the face of the person who went behind the wagon, but thought it was the respondent from his dress, form and gait.

It further appeared from the testimony of Campbell and Bryant, that immediately after the fire they informed the owner of the barn and others that the fire had been set, and what they had seen of the respondent going towards and into the barn, and of the circumstances connected therewith, and that within an hour after the fire was set they procured the arrest of the respondent.

It also appeared that the hay, straw and chaff were about two inches deep on the floor of the loft where the fire was found, and

that some bunches of matches partly consumed were found there. There was evidence tending to show that a circular place in the hay, straw and chaff, in diameter about the size of a bushel basket, was burnt, but that no part of the floor or of the building was burnt or even charred, but that a spot on the floor was blackened.

The court charged the jury that in order to convict the respondent it was necessary to prove that, with a willful and malicious intent to burn the barn, he set fire to the hay, straw and chaff on the floor of the loft in the barn ; but that no actual burning whatever of the floor of the barn or of any part of the building was necessary in order to sustain the indictment; that if the respondent with such willful and malicious intent set fire to the hay, straw and chaff on the floor of the loft in the barn, it was a " setting fire, with intent to burn, to the barn," though the fire was put out before any part whatever of the woodwork of the barn was burned.

The court further charged the jury, in regard to the testimony of Campbell and Bryant and the evidence to discredit them, that the fact that Campbell and Bryant acted upon their belief and knowledge that the person they saw was the respondent and caused him to be arrested within an hour after the fire was set, tended to corroborate their testimony as to identifying him.

The respondent excepted to that portion of the charge of the court in which the jury were told that no actual burning whatever of the floor of the barn or of any part of the building was necessary in order to sustain the indictment, and also to the charge in regard to the testimony of Campbell and Bryant.

*Martin G. Everts*, for the respondent, claimed that the indictment could not be sustained without proving an actual *burning* of some part of the barn, and cited Wharton's Crim. Law 1662 ; 41 Eng. Com. Law 295 ; 38 *Id.* 29 ; 5 Cushing 427 ; *Sarah Taylor's case*, 1 Leach 51 ; Hawkins P. C. 166 ; 2 East's Crim. Law 1020 ; 3 Chitty's Crim. Law 1120 ; Roscoe's Crim. Ev. 274 ; Arch. Crim. Pl. 374 ; 16 Mass. 105.

*A. A. Nicholson*, State's attorney, with whom was *E. N. Briggs*, for the prosecution.

The offence prohibited by the statute on which this indictment is

12

. founded, is the setting on fire *with intent to burn*, and not an *actual burning*. All the authorities cited by the defence in which the doctrine is laid down that an *actual burning* is necessary to constitute the offence, have reference to the crime of *arson*, and not to the offence created by this statute. It is evident that the legislature intended to make it a crime to set a fire *with intent to burn*, thus constituting an offence different from arson.

POLAND, J. The main question in this case is, whether there can be a legal conviction under the 4th section of chapter 104 of the Compiled Statutes for an attempt to commit the crime of arson, without an actual burning of some portion of the building.

The words of the section are, "If any person shall willfully and maliciously set fire, with intent to burn, to the dwelling house of another, or any outbuildings adjoining thereto, or to any other building, etc."

The defendant's counsel insist that under this statute no attempt to burn a house or other building, however deliberate or formidable, constitutes the offence provided against, unless the building be actually set on fire and some part of it burned; and several adjudged cases in England, and the language of several respectable elementary writers on criminal law, are relied on to support this view.

Arson, at common law, consisted in the willful and malicious burning of the house, or outbuildings adjoining thereto, of another; or, as Mr. Chitty defines it, the house or barn of another. To constitute the offence there must be an actual burning of some portion of the building, but it was not necessary that the building should be wholly consumed; if any portion of the building was burned the offence was complete.

Various statutes were enacted in England, at an early period, extending the offence of arson to other buildings and property than those included within the common law definition, and also modifying the punishment, and especially to limit or extend benefit of clergy to that class of offences.

In all these statutes prior [to that of the 9th of GEO. 1st, so far as I have examined them, the words *burn*, or *cause to be burned*, are used in describing the offence.

The act of 9 Geo. 1., chap. 22, which was passed to extend the punishment for arson to cases of rescue of any person in lawful custody for that offence, and for hiring any person to aid in committing it, and also to take away benefit of clergy from the offence, known in its day in England as the " *Black Act*," first used the words *set fire to* : " If any person or persons shall set fire to any house, etc."

After the passage of this act questions arose in indictments under it whether this change of language had really changed the nature of the offence, and whether it was still necessary to prove an actual burning in order to make the offence complete.    The judges held that even under this statute an actual burning must be proved, because they said this statute was not intented to alter the nature of the crime, or constitute any new offence, but that its object was to exclude the principal offender from his clergy more clearly than he was before ; see *Taylor's case*, Leach's Crown Cases 51 ; *Spalding's case*, Leach's Crown Cases 217 ; *Breeme's case*, Leach's Crown Cases 219 ; 1 Hawk. P. C. 166 ; 2 East's Crown Law 1020.

Since the act of 9 Geo. 1, the English statutes upon the subject of arson, extending the subjects of it and modifying the penalty, have generally used the words *set fire to*, instead of the words *burn*, or *cause to be burned*, and they have always received the same construction as under the act of 9 Geo. 1, and it has never been suggested that any new offence was intended to be created, or that the mere attempt to commit arson was thereby provided against.

It is not denied by the counsel for the defendant that the legislature, by the act of 1844, (sec. 4, chap. 104, Comp. Stat.,) intended to punish the mere unsuccessful attempt to commit the crime of arson, but they insist that the language used is so legally inappropriate and insufficient to that end that the design failed, and they succeeded only in re-enacting the existing statutes punishing arson itself.

In the first place they allege that the operative words of the act itself, *set fire to*, by their own natural and inherent signification, mean the same as *burn* or *set on fire*, and that to give them any less signification is to force them out of their natural office.

But it seems to us that this claim as to the natural force and meaning of the words cannot be sustained, and that though the words may perhaps, without forced construction, well enough be so understood, still that they may as reasonably and fairly be understood the same as *put fire to,* or *place fire upon,* or *against,* or *put fire in connection with,* and that, especially when those words are used in connection with other words clearly showing that they are used in this latter sense, they may bear such meaning without the least violence to their natural import.

But if this be so, it is urged that these words have received a legal meaning, by a long course of judicial decision and construction, so firmly fixed and settled that when used in a statute it should be intended they were used in that sense, even if their natural meaning were different in the connection in which they are used.

The general principle is quite familiar and settled, that where the legislature copy and enact here an existing English statute, or one from one of the United States, which statute has a settled judicial interpretation that is ordinarily understood, we adopt that interpretation with the statute.

But this is not commonly true of all the language used in a statute, and can hardly be true of any particular word, or set of words, except such as are mere technical legal words and phrases. It is often the case that the precise meaning of words is made to vary by the connection in which they are used, and the evident purpose and object of the enactment itself.

The English judges appear to have felt somewhat embarrassed in saying that the words *set fire to,* in the 9th of GEO. 1, meant the same as *burn,* or *caused to be burned,* in the previous statutes, and by the common law, but they justified it by saying that evidently the statute did not intend to change the nature of the offence, but was passed for a wholly different purpose.

Mr. East, an early writer on criminal law, after saying that an actual burning must be proved to constitute arson, goes on to say, " the statute of 9 GEO. 1, chap. 22, does indeed, in enacting the felony, make use of the words *set fire to,* but I am not aware of any decision which has put a larger construction on these words than prevails by the rule of the common law, and

the contrary opinion may be collected from what is said in Spalding's case, and Breeme's case, and in the case 'of Sarah Taylor." Our statute of 1844, though it contains the words *set fire to,* is not a copy of any English statute, not even in substance, and contains very important qualifying words contained in no English statute. While all the English acts where these words are used seem evidently passed for the purpose of extending the limits or changing the penalty of the crime of arson, our statute was confessedly enacted to punish the act of attempting to commit arson, where arson was not in fact committed.

Our statute contains the important qualifying words " *with intent to burn,*" which are not contained in any of the English statutes, most clearly implying that the offence intended to be covered by the statute was something short of an actual burning. The opposite construction would make the statute read, " If any person shall willfully and maliciously *burn, with intent to burn,* any house, etc." It is conceded also that the construction claimed for these words would render the act of 1844 wholly nugatory, and neither add to nor in the slighest particular affect the existing law of the State. The legislature had many years before extended the crime of arson to the burning of every species of building and property named in the act of 1844, and the penalties imposed by the latter act are in the very words of the existing statutes against arson, so that the statute is to be wholly rejected or have such effect and operation given to it as the legislature clearly intended it should receive. In the construction of statutes, as in the construction of mere private instruments and writings, the great and leading rule is, what was the intention of those using the language as shown by the language used, and this intent is to prevail if it can be done without violence to the language used.

Statutes, like all other written documents, are to be construed so as to give effect to all the language used, if it can reasonably be done, and this applies as well to penal statutes as to any others.

So it is a well established rule in the construction of a statute that it is to be construed as it was supposed to be enacted, in reference to and in the light of all the existing statutes upon the

same subject, and to be so construed in connection with them that all may have effect and force if possible. The same rule is expressed in the old books, that in construing a new statute, the old law, the mischief, and the remedy are all to be considered.

We are fully mindful of the established rule of law as to the construction of penal statutes; that they are to be construed strictly, and that a crime is not to be created by any forced construction of language, but that it must fairly come within the words, as well as within the intent and spirit of the statute, but at the same time, this rule, in modern times at least, does not require an abandonment of the usual and ordinary rules of construction and common sense. Looking to the language of the statute itself, the already existing statutes on that subject, the evident purpose and object of the statute as to the mischief intended to be remedied, we do not feel doubtful of the construction to be given to the statute, and believe that it was correctly construed by the court below. The language used in the statute we think was chosen with care to avoid the very objections which are now made to this construction of the act, and that every word is effective and operative. They intended to punish the mere attempt to commit arson though not in fact committed, but if they provided generally against such attempts, great doubt and uncertainty might arise as to what constituted such attempt; the most remote and distant preparation might perhaps be deemed enough. They therefore provided merely against the actual application of fire itself. The word *to* in the statute (on which the argument of the defence is mainly hung, and which it is claimed is wholly thrown out by our construction,) we think was used with purpose and effect also. It is now urged that men may be indicted and convicted for setting fires, with intent to burn buildings, though set at ever so great a distance therefrom, and that doubt and danger will arise from that source. We think this very difficulty was purposely guarded against by the use of the word *to*, that is, fire must not only be applied, but directly *to*, or in immediate contact with the building, and not at a distance, though it thereby was designed to burn it.

In our opinion this statute, instead of being regarded as wholly unmeaning, may have effect, and sensible effect, given to every

State *v.* Dennin.

part of it, so that it can stand sensibly with other statutes on the same subject, and fully carry out the intent of the legislature; and at the same time have no violence done to its words, or to any rule of law; governing the construction of penal statutes.

The cases cited from Mass. we think have no bearing, for their statutes are wholly in reference to the crime of arson, and the act of 1804, under which the case of *Comm.* v. *Van Schaack*, 16 Mass. 105, arose, and in which the words *set fire to* are used, goes on and adds " and by the kindling of such fire such house shall be burnt, etc." The court in that case say, " the statute has left the burning to be defined by the common law, and by that, if any part of a dwelling house, however small, be consumed by the fire, the offence is complete, and so is within the statute."

The respondent also objects to the charge of the court in reference to the testimony of Campbell and Bryant.

Those witnesses had testified to seeing the respondent go into the barn just before the appearance of the fire, and professed to have known and recognized him at the time, and the case evidently rested mainly upon the strength and validity of their identification of the respondent.

The respondent, to weaken this, had given evidence tending to show that these witnesses, at the examination of the respondent immediately after the fire, had testified less confidently as to their ability to identify the respondent than they had at the trial. In their examination it had come out without objection that they immediately communicated what they saw of the defendant before they had time to deliberate or calculate upon the subject, and that they in fact caused the immediate arrest of the respondent, without any other cause or ground that appears, except what they saw themselves. The evidence given by the respondent had a tendency to establish that these witnesses had been operated upon by some influence to strengthen their testimony, and to show that really, at the time of the transaction, they did not recognize the respondent as fully as they now professed to have done. Now it seems to us that the fact that at the very moment of the transaction they professed to recognize him, and acted upon that belief, and caused the respondent to be arrested, did naturally and reasonably tend to increase the credit to be given to their testimony as to

identity, and to rebut the effect of the evidence as to their ina-
bility to recognize him given by the respondent, and that therefore
the suggestion to the jury on this subject was legitimate and
proper. The respondent's exceptions are therefore overruled.

BENNETT; J., dissented.