# CASES

## ARGUED AND DETERMINED

### IN THE

# SUPREME COURT.

## STATE v. WILKINS AND BLOW.

### GENERAL TERM, 1892.

*Evidence. Conversation in presence of respondent. Rape.
Failure to complain. Opportunity to escape. Habit.
Evidence of character after crime. Charge of
court. Inapplicable to evidence. As
to failure to complain.*

1.  The indictment was for rape, and the state from the whole
    case, claimed, although its evidence did not directly show,
    that after the commission of the crime the respondents
    went in a certain direction. *Held*, that evidence of shouts
    by unknown persons from that direction at about the same
    time was admissible, the expressions being similar to those
    used by the assailants.

2.  The claim of the state was that the assault was committed by
    the respondents jointly with one B., and the prosecution
    was allowed to show certain words between the prosecutrix
    and B. *Held*, as against the objection that the conversa-
    tion was not in the hearing of the respondents, that they
    were in the presence of each other and near enough to have
    heard and must be presumed to have done so.

3. The alleged rape was on Friday, and the prosecutrix made no complaint until the following Tuesday ; and the respondents claimed that this tended to show no rape committed. *Held*, that the prosecutrix might testify in explanation, that she was ashamed to tell her relatives and affianced husband, and only told the chief of police when he was to act as her interpreter in court, and she supposed she must.

4. One G., who was with the prosecutrix at the time of the assault, testified that he then recognized B. as one of the assailants. On the following morning, being with several persons, among whom was B., he said that none of the assailants were then present. As a reason for this the witness stated that he did not wish to alarm B. and cause him to flee. *Held*, that it might be shown that this witness afterwards pointed out B. to the officers, who arrested him upon that recognition.

5. The state claimed that the respondent made an assault upon G. and the prosecutrix together, and that G., after resisting as long as he could, ran for help. *Held*, that the respondents could not show that, before being taken for the rape, they were arrested for the assault upon G., gave bail, and made no attempt to escape.

6. That a person is in the habit of doing a particular thing at a particular time, has no tendency to show that he did not do some other thing at some other time.

7. If a respondent, in putting in issue his character, inquires of his witnesses as to his reputation both before and after the alleged crime, the state in rebuttal may do the like.

8. *Held*, that the court correctly instructed the jury as to the weight to be given evidence of good character, and did not, by the words, "you will consider with reference to the young men of this class whether they would be likely to bring their good character to bear in reference to this very crime, if an opportunity presented itself," intend or make any invidious distinction against the respondents.

9. That the prosecutrix did not make speedy complaint is not evidence tending to show that no rape has been committed, but simply a fact to be considered along with the circumstances surrounding it, as bearing upon her credibility as a witness.

10. Although a request does not embody good law, if the court undertakes to charge upon its subject matter it must do so correctly.

11.  *Held*, that the charge as to the failure of the prosecutrix to make complaint was erroneous, for that it did not instruct the jury that such failure bore upon the credibility of the prosecutrix as a witness, but did instruct them that it bore upon the question of consent, although that question was not in the case.

12.  The evidence of the state, including that of the prosecutrix, tended to show a violent struggle between her and her assailants before the commission of the crime. A physician who examined her carefully soon after the assault, testified to finding no marks of violence upon her person. In answer to a request from the respondent to charge that this both tended to impeach the prosecutrix and to show that no such crime was committed, the court instructed the jury that they should consider what was probable under such circumstances; that one person so assaulted would vigorously resist, while another might be so overcome as to offer no resistance. *Held*, erroneous, and not fairly applicable to the case made by the evidence.

Indictment for rape. Plea, not guilty. Trial by jury at the September term, 1891, Chittenden County, Ross, C. J., presiding. Verdict guilty. The respondents except. The opinion states the case.

*Henry Ballard* and *J. A. Brown* for the respondents.

Testimony as to shouts from the direction of the Catholic church was inadmissible. They were not sufficiently connected with the transaction to be a part of the *res gestae*. Rapalje's Crim. Proc. 349; *Holt* v. *State*, 9 Texas App. 571.

Evidence of the prosecutrix as to when she first told Dumas that she had been raped was improperly admitted. 1 Rus. Crimes, 688, 689; Roscoe's Crim. Ev. 23; *State* v. *Niles*, 47 Vt. 86.

The respondents should have been permitted to show that having been arrested for an assault upon Gonyeau they made no attempt to escape. Rap. Crim. Proc. 358; *People* v. *Rathburn*, 21 Wend. 509.

The respondent Blow had a right to show what his usual custom was in going from Burlington to Winooski as bearing upon the question whether he was seen upon the highway bridge the morning after the assault. *Hine* v. *Pomeroy*, 39 Vt. 211.

The state was improperly permitted to show the reputation of the respondents after the commission of the crime. *State* v. *Kinley*, 43 Iowa 294; Rap. Crim. Proc. 402.

The fact that the prosecutrix made no complaint is evidence tending to show that no rape had been committed, and the request of the respondents that the court so charge should have been complied with. 1 Rus. Crimes, 688; Roscoe's Crim. Ev. 862.

The effect given by the court to evidence of the respondents' good character was erroneous. *State* v. *Daley*, 53 Vt. 446; Rap. Crim. Proc. 402; *People* v. *Pearsall*, 50 Mich. 236.

*J. E. Cushman*, state's attorney, and *Seneca Haselton*, for the state.

Evidence of the conversation between the prosecutrix and Bedard was properly admitted. The exceptions show that it was in the presence of the respondents, and it must be presumed that they heard it. *Boutelle* v. *Westchester Fire Ins. Co.*, 51 Vt. 4.

The prosecutrix might explain the reason why she made no complaint to her sister and did first complain to the chief of police. *State* v. *Niles*, 47 Vt. 82; *Jenne* v. *Joslyn*, 41 Vt. 478.

Under the circumstances of this case it was permissible to show that Gonyeau pointed out Bedard to the officers when in search of him. *State* v. *Dennin*, 32 Vt. 158; *State* v. *Hopkins*, 50 Vt. 316; *State* v. *Flint*, 60 Vt. 304; *Zell* v. *Commonwealth*, 94 Pa. St. 258; *Commonwealth* v. *Wilson*, 1 Gray 337; *Hewitt* v. *Corey*, 23 N. E. (Mass.) 223.

Evidence of habit is never received as independent evidence, but only as corroborative.   *Hine* v. *Pomeroy*, 39 Vt. 211 ; *Hardy* v. *Cheney*, 42 Vt. 417 ; *Mathias* v. *O'Neil*, 12 Western (Mo.) 229.

The evidence of the respondents as to their good character having covered the period both before and after the commission of the crime, the state might embrace the same period in its questions.   Best Ev. s. 261 ; *Gotlcib* v. *Beach*, 40 Vt. 278 ; *Lythe* v. *Bond*, 40 Vt. 624 ; *State* v. *Arnold*, 50 Vt. 731 ; *Commonwealth* v. *Sackett*, 22 Pick. 394 ; Roscoe's Crim. Ev. 100.

The charge of the court was correct.   *Stevens* v. *Dudley*, 56 Vt. 159 ; *Ashley* v. *Hendee*, 56 Vt. 216 ; *Reed* v. *Reed*, 56 Vt. 494 ; *Doon* v. *Ravey*, 49 Vt. 295 ; *State* v. *Daley*, 53 Vt. 442 ; *State* v. *Roberts*, 63 Vt. 147 ; *State* v. *Center*, 35 Vt. 378 ; *Mellendy* v. *Bradford*, 56 Vt. 148 ; *Follett* v. *Roxbury*, 55 Vt. 552 ; *Fletcher* v. *Cole*, 26 Vt. 170 ; *Brackett* v. *Wait*, 6 Vt. 411.

TYLER, J.   The evidence of the state tended to show that Mary Pratt, on the evening of October 5, 1890, came to the city of Burlington from the village of Winooski by horse-car with one Albert Gonyeau, to whom she was then engaged to be married and whom she married a few days later ; that they started to return to her home in Winooski, walking along the highway called the lower road, until they reached the southeasterly corner of Athletic Park, in Burlington, where they turned from the lower road to pass along the easterly end of the park to go towards another highway running nearly at right angles with the first and leading past the park to and across the railroad track, intending to go to the home of Mary on Winooski Flats by way of the railroad track ; that by the last named route they could reach their destination by travelling a considerably less distance than by the lower road.

The evidence of the state further tended to show that there was a gate for the passage of teams, located in the easterly end of the park, and that after Gonyeau and Mary had passed the gate, then partially ajar, going towards Winooski, the respondents, Wilkins and Blow, and one Philip Bedard, simultaneously came out of the park through the gate in a menacing manner; that one of them in the presence of the other two said to Gonyeau, " Get out of here, you "    *    *    *    *    that a struggle then ensued, during which two of the assailants respectively armed themselves with a piece of board and scantling, Gonyeau being struck upon the head with the scantling, which cut through his hat and inflicted a wound upon his head; that during the struggle Mary started to run away from the scene of the affray in the direction they had just come, whereupon one of the assailants struck her in the chest and clinched her, throwing her upon the ground; that Gonyeau frequently shouted " police " during the entire time he remained at the park, which he estimated to be from five to ten minutes; that he was powerless to repel his assailants, and believing that he must soon be overpowered, ran to William Couture's house, situate on the lower road and thirty-six hundred feet distant, leaving Mary struggling with her assailant, who threw her upon the ground; that Gonyeau immediately returned to the park from Couture's, running the entire distance, and bringing with him a party of men and boys and a special policeman, Brunell, and that Gonyeau and the party searched the interior of the park to find Mary and the assailants, but without avail.

The state's evidence further tended to show that after Gonyeau had thus left the park, and before his return thereto, the three persons seized Mary and each in turn against her will, ravished her, while the other two held her, one by the arms and the other by the legs; and that as soon as liberated Mary went to the house of her sister's husband,

one Edward Laundry, living on North Winooski Avenue in Burlington and westerly from the horse-car barn, and that she and Laundry soon started on foot for Winooski. The evidence also tended to show that the three persons were the respondents Wilkins and Blow, and Bedard.

The evidence of the state further tended to show that the crime was committed about half-past seven in the evening of October 5th ; that Bedard, Wilkins and Blow on the following day each admitted being together from about half-past six till about half-past eight o'clock that evening at the house of one George Wilkins, and the respondents so testified, and that they were together till about ten o'clock, and that they were not at Athletic Park at all that evening.

The respondents as part of their defence set up an *alibi* and introduced evidence tending to show that they and Bedard were all three at the house of one George Wilkins, father of the respondent, Frank Wilkins, which was on Hyde street, from about five minutes past seven till about twenty-five minutes past eight o'clock that evening, and that Wilkins and Bedard were there from about six o'clock, and thus stated and claimed in their opening statement to the jury before any evidence was introduced by either party.

The evidence of the state tended to show that a few minutes past seven o'clock on that night, Bedard, Wilkins and Blow were seen by one Eben Johnson and wife, who lived on Hyde street, but a short distance from the park, passing by and around their house and going in the direction of the park ; that about twelve to fifteen minutes past seven o'clock several persons, including one Charles Spaulding, saw three young men at the intersection of Hyde street with North Winooski avenue, which was lighted by an electric light, standing but a short distance from the intersection ; that the junction of the streets is nearly opposite the southwesterly corner of the park and nearly opposite Spaulding's hidehouse, so-called, which is about five hundred and forty feet

from the corner of the park where Gonyeau and Mary turned from the lower road, and that the horse-car barn herein referred to is about five hundred and seventy feet from Hyde street corner on North Winooski avenue, and westerly therefrom ; that the three persons were soon after seen starting from Hyde street corner along the lower road towards the southeasterly corner of the park, and were soon thereafter seen by Gonyeau and Mary, coming behind them near the southeasterly corner ; that Spaulding recognized and spoke to Bedard near the hide-house, and that the three persons were recognized by Gonyeau and Mary as the three persons who sprang out of the gate.

There was no direct evidence introduced by the state tending to show where Bedard, Wilkins and Blow went after the commission of the crime till about half-past eight, when they were seen on Hyde street, coming from the direction of their homes, near the intersection with North Winooski avenue ; that from there they went directly to the horse-car barn, situate about five hundred and seventy feet westerly from the corner, where they remained a short time, then went to the vicinity of Trick's meat market and returned to the horse-car barn and remained till about ten o'clock.    But the claim of the state on argument from the whole case was, that after the commission of the crime the respondents and Bedard went to the hill on the south side of and separated from the park by the lower road (upon which elevation were the Catholic cemetery and the old French church ; the cemetery being bounded by Winooski avenue, or lower road, and westerly by Hyde street), and from thence to the house of Wilkins, which was southwesterly therefrom on Hyde street.

I.    The testimony of Gonyeau, Brunell and others as to hearing shouts by unknown persons from the vicinity of the old Catholic church on the evening of the alleged rape, was properly admitted.   The expressions were of a similar char-

acter to those made by the assailants of Gonyeau and the
Pratt girl at the park earlier in the evening, which tended to
show that they were made by the same persons. The old
church was in the direction of Wilkins' house, in which the
respondents claimed to have passed that evening. The evi-
dence tended to show the direction which the assailants took
after the outrage had been committed. The statement
claimed by the state to have been made by respondent Wil-
kins next day to the witness Davis was that he had heard
from one West that a rape had been committed, and that it
was said that the boys ran up the hill afterwards. The evi-
dence was not admitted as a part of the *res gestae*, but as a
circumstance, in connection with other evidence, tending to
identify the respondents as the guilty parties.

II. The state's witness, Mary Pratt, testified that she
knew and recognized respondent Bedard, and that he spoke
to her after the outrage had been committed. Respondents'
counsel objected that the testimony of the witness did not
show that the conversation between herself and Bedard was
in the hearing of the other two respondents. A reference
to the exceptions shows that this objection was not well
founded :

Q. Who came through the gate with you?

A. Bedard.

Q. Where were the other two?

A. The other two entered the gate also.

Q. When you came through the gate with Bedard, as
you say, did you come to where the electric light was shin-
ing?

A. Yes, sir.

Q. Where did the others come to?

A. They came, the three.

Q. When you came into the electric light did you recog-
nize any of the boys?

A. Yes, sir.

Q. Which one did you recognize?

A. Bedard.

The witness then stated what Bedard said to her. We think the evidence clearly tended to show that the witness and the three respondents were all in each other's presence, so that Wilkins and Blow were near enough to have heard the remarks of Bedard to the witness and were presumed to have heard them. *Boutelle* v. *Westchester Fire Ins. Co.*, 51 Vt. 4.

III. It was stated in the opening argument of respondents' counsel that the state's witness, Mary Pratt, made no complaint of the rape upon her to any person until the following Tuesday, when she made it to the chief of police, Dumas, and that from this fact it would be claimed that no rape had in fact been committed. It appeared in evidence that she made no complaint to her sister, to whose house she went immediately after the alleged outrage, nor to her mother when she reached home, and she testified without objection that she told the chief of police the next Tuesday what had been done. She had testified that she did not tell her sister because she was ashamed to tell her. Then, as explaining this apparently unnatural conduct in first telling the chief of police, she was asked why she told him, and she replied that he was to speak for her as her interpreter, that he asked her, and because she had to tell him for the court. It was as much as to say that from shame she had kept the matter secret until she was called into court, when she was compelled to and did tell the whole truth. It was but fair to the state to permit her to give these reasons to prevent an improper use being made of the fact of her silence until that time, and of her then telling her story. She merely gave a reason for her previous silence which was permissible. *State* v. *Niles*, 47 Vt. 82, is full authority for the admission of this evidence.

IV. There was an apparent contradiction in the testimony

of Gonyeau, he admitting on cross-examination that on the
next morning after the assault he did say that Bedard was
not in the crowd at Winooski, when he had claimed that he
recognized him in that crowd.   Gonyeau had assigned as a
reason for saying that he did not recognize Bedard in the
crowd that he did not wish to alarm him and cause him to
flee.   To meet the claim that might be predicated upon the
admission of Gonyeau it was clearly admissible to show that
he subsequently pointed out Bedard to the officers, who ar-
rested him, acting upon Gonyeau's recognition.   In *State* v.
*Dennin*, 32 Vt. 158, the respondent, to weaken the force of
the evidence of certain witnesses who had testified to his
identity with the criminal, introduced evidence tending to
show that these witnesses had testified less positively at a
preliminary examination.   It also appeared that the same
witnesses, directly after the commission of the crime, as-
serted positively the identity of the respondent with the per-
son they saw commit the offence and caused his arrest.   It
was held that this evidence was admissible to rebut the effect
of the evidence of the respondent as to their inability to
recognize him.   The evidence was proper for the purpose
for which it was introduced.   On any ground it would have
been proper for the officers to have testified that they ar-
rested the two respondents upon their being pointed out by
Gonyeau as two of the persons who assaulted nim.

V.   It appeared that the respondents were, on the Monday
following the assault, arrested for an assault upon Gonyeau.
It was offered to show that upon this charge they were re-
leased upon furnishing bail in the sum of $50 and that they
returned to their work and did not run away.   These were
irrelevant facts and were properly excluded.   The facts that
they had been arrested and were out on bail and did not run
away, were not admissible in their favor as tending to show
innocence, for they were in the custody of the law.   The
legal presumption is that their bail had them in such durance

as to be able to produce them in court.   *Worthen* v.  *Prescott*, 60 Vt. 68.

It has sometimes been held that when a person accused of a crime had an opportunity to escape and declined to avail himself of it, the fact might be admitted in evidence in his favor.   But in this case the respondent had not been accused of the crime with which he is now charged when he was admitted to bail, and it was not stated in the offer that his bailor gave him an opportunity to escape.   In *The People* v. *Rathbun*, 21 Wend. 518, cited on the respondents' brief, Cowen, J., declared strongly against the admission of such evidence and said that at the most it was a declaration in the respondent's favor, a mere assertion of his innocence.

VI.   The witness Gonyeau testified that about eight o'clock on the next morning after the rape, while at Winooski village, he saw two men coming across the highway bridge, which crosses the Winooski river between Burlington and Winooski, and that he recognized them as two of his assailants of the night before.   It was claimed by the state that one of the persons so seen was respondent Blow.   It appeared that Blow lived with his father in Burlington and worked in Winooski, arriving there about seven A. M. and returning at night after his day's work was done.   Blow testified that he went alone to his work that morning, leaving home at about half-past six and arriving at the shop where he worked from five to fifteen minutes before seven, and that he did not go by the highway bridge but by the railroad bridge.   He testified that he did not cross the highway bridge that forenoon with any other person, and that he usually returned home at night by that bridge.   His counsel asked him the question whether he had been in the habit of going by the way of the railroad bridge morning and night, which was excluded.   Evidence as to the respondent's habit in going to his work by one route could not reinforce his testimony that on this day he was not seen crossing the high-

way bridge an hour after he claimed to have arrived at his work. There was no conflict between his testimony and that of Gonyeau as to the time when he went to his work on that morning nor as to the route by which he went. The question was whether he was seen crossing the highway bridge in company with another person at a later time that forenoon. On this point he claimed to be clear in his recollection. The evidence was properly excluded.

VII. The same reasoning applies to the seventh exception. The evidence offered relative to Wilkins' ability to sing, and his habit of singing while his sister played accompaniments upon the organ was wholly immaterial. It might have been true that he was in the habit of singing with his sister every evening, and that he in fact sang with her on that evening ; yet that fact had no tendency to show that he was not absent from the house at the particular time in question. The state introduced no evidence tending to contradict Wilkins' claim that he was at the Wilkins house during a considerable portion of that evening.

VIII. The questions put to witnesses by respondent Blow's counsel in respect to the respondent's reputation and character, and the answers thereto, were too broad and might have conveyed a wrong impression to the minds of the jury. As was said by Barrett, J., in *State* v. *Arnold*, 50 Vt. 731, the evidence was "designed to operate beneficially to himself, the respondent, as a matter of fact, as showing the unlikelihood of his having done the act charged against him. In this view it was proper to show the fact to be not as he testified." In this case it was proper for the state to ask questions in rebuttal as broad as those propounded by the respondent in order to dispel any wrong impressions that might arise from the answers to the latter. In *Commonwealth* v. *Sacket*, 22 Pick. 394, it was held that when the respondent introduced evidence of his good character prior to the commission of the crime charged, the government

might prove that subsequent to that time his character had been bad, on the ground that the descent from virtue to vice was in general gradual, and the fact that a defendant sustained a bad character after the commission of the alleged crime would tend to rebut the claim of prior good character, that it was proper to submit it to the jury to have such weight with them as it was entitled to.

IX. The court in substance instructed the jury that a respondent always had a right to put in evidence in his favor his previous good character, and to have it considered whether, if he had borne such a character, he would be likely to commit a crime. This was a compliance with the general rule of law, and is as stated in *State* v. *Daley*, 53 Vt. 446. If, by the subsequent remark, "You will consider with reference to the young men of this class whether they would be likely to bring their good character to bear, in reference to this very crime, if an opportunity presented itself," an invidious distinction was intended against the respondents on account of their rank or station, as their counsel contend, it was of course error. But it seems clear that the court only meant to have the jury consider just what safeguard previous good character would be to such men as the respondents were when tempted to commit crimes.

X. The respondents, among other requests, requested the court to charge the jury as follows:

"The fact that the witness, Mrs. Gonyeau, made no complaint or disclosure that she had been outraged and raped, to her sister, whom she saw within a very short time, perhaps one-half hour, after it was claimed to have been done, nor to her mother nor father, whom she saw on the same evening and with whom she was living and staying at this time, nor to anybody till the second day after, when she told it to the witness Dumas, an entire stranger, for the first time; the fact of such omission to make any complaint about it is evidence which tends to show that no rape was committed."

Upon this point the court instructed the jury that it was a

circumstance to be considered by them, that ordinarily a woman, having had such an offence committed against her, would speak of it to her near friends, make some complaint; but that anything of that kind was to be weighed with reference to the circumstances and the surroundings; that her age, her expectation to be soon married, her being with her intended husband, and any other circumstances were to be considered in connection with her omission to make disclosure; that it was for the jury to say what weight they would give to that fact; that usually the failure to make complaint bore somewhat upon the question whether the prosecutrix consented or not, because if she consented she would not be as likely to disclose; that the jury should take the case and all the surroundings and say whether to their minds there was any evidence that the prosecutrix consented; that if so it would seem that she must be false in saying that she was held, that she was struggling.

To the charge upon this point and the refusal of the court to comply with the request the respondents excepted.

The request did not embody a sound proposition of law. The failure of a prosecutrix to make complaint does not directly tend to show that the alleged crime was not committed; it does bear directly upon the credibility of her testimony.     But the court undertook to state the rule of evidence upon this subject and was bound to state it correctly.     Judge Woodruff, in *Baccio* v. *The People*, 41 N. Y. 265, said that the reason for the admission of the declarations of the prosecutrix is, that it is so natural as to be almost inevitable, that a female upon whom this crime has been committed will make immediate complaint to her mother, or other confidential friend, and that her failure to do so would be strong evidence that her affirmation on the subject was false.     In *Higgins* v. *The People*, 58 N. Y. 377, Church, C. J., said that any considerable delay on the part of a prosecutrix to make complaint of the outrage con-

stituting the crime of rape, is a circumstance of more or less weight, depending upon the other surrounding circumstances ; that there may be many reasons why a failure to make immediate complaint should not discredit the witness ; that there is no iron rule on this subject; that the rule is founded upon the laws of human nature, which induce a female to complain at the first opportunity.

In the nature of the case there can be no invariable rule. When the prosecutrix becomes a witness the fact that she made disclosure immediately after the alleged crime is admissible in corroboration of her testimony ; on the other hand, her silence is a circumstance that tends to discredit her story. In *State* v. *Knapp*, 45 N. H. 148, it is said that how much the delay in making the complaint ought to weigh against the prosecution must depend upon the circumstances of each case. *State* v. *Niles*, 47 Vt. 82. Lord Hale said that this accusation is easily to be made, hard to be proved, and harder to be defended by the party accused, notwithstanding his innocence. It is stated in all the works upon criminal law that the credibility of the testimony of the prosecutrix must be left to the jury upon the circumstances of fact by which it is attended, and, among others, whether " she presently discovered the offence and made search for the offender," or whether she concealed the injury for any considerable time after she had an opportunity to complain.

In this case the respondents were on trial for an atrocious crime, committed, as the state's evidence tended to show, with great brutality. The prosecutrix was an important witness. A case could not be made out without her testimony. The credibility of her story must be submitted to the jury with all the attending circumstances. It appeared that she had gone directly from the scene of the assault to the house of her sister, but made no disclosure to her ; that in company with her sister's husband she started for her home and with him met her father and lover on the way, but made

no complaint to them, nor to her mother when she arrived home, nor to any one until the following Tuesday, when she was called into the police court as a witness in a prosecution which Gonyeau had instituted against two of the assailants for the assault upon him, and told the chief of police of the outrage upon her, supposing she was then obliged to tell the whole story.

The respondents were entitled to have the jury instructed that the silence of the prosecutrix and her neglect to have any steps taken for the arrest of the criminals on the night of the outrage were circumstances which bore upon the credibility of her testimony; that these circumstances were to be considered by the jury and, unless explained, they made weight against the prosecutrix's story. The attention of the jury was directed to the reason assigned by the prosecutrix for her silence, but we do not find in the charge a clear statement of the effect generally to be given to a failure to make disclosure. It is possible that expressions in the charge upon this subject would have amounted to a compliance with the rule had the court omitted what it said about *consent*. The information was for rape, and the state's evidence tended to support it. The defence was an *alibi*. The respondents testified that they were not at the park that evening, and introduced evidence tending to show that they were at another place; therefore the question of *consent* to the alleged act of the respondents did not arise, and the charge in this respect was not applicable. It is indeed essential to the crime of rape that the act be done without consent, but in this case there was no claim of consent. The jury might well have understood from the charge that the fact of not complaining was relevant only to the question of consent, and that, as there was no evidence of consent the silence of the prosecutrix had no significance.

XI. The respondents further requested the court to charge that, "The testimony of the witness, Dr. Peck, that a careful

and thorough examination of the witness, Mrs. Gonyeau, of her limbs and hips, failed to disclose any bruises or marks of violence of any kind upon her, is evidence which tends to show that no such assault upon her, or such struggles with her assailants as she testified to, could have taken place, and is evidence which tends to show that she was not outraged and raped in the way and manner alleged ; that such evidence of the witness, Dr. Peck, tends to impeach the testimony of the witness, Mrs. Gonyeau, and also is evidence which tends directly to show that no such outrage and rape could have been committed, in the way and manner that she says that it was."

Upon this subject the court instructed the jury that the absence of marks was a fact for them to consider ; also what a young girl would do in the circumstances, if it were true, as she claimed ; that different persons would not act in the same manner in the same circumstances ; that when a crisis came some persons were without much presence of mind, and would not know what to do, while others would have their presence of mind sharpened and would do the most vigorous thing ; that in the case of a fire some persons would do the most judicious things, while others would act foolishly ; that the jury must weigh the testimony with reference to human actions and experience and say whether this girl, being grasped and held, as she says she was, could have done much, being frightened, overpowered, or for some other reason, thinking it was entirely useless.

To the charge upon this point as given, and to the refusal of the court to charge as requested, the respondents excepted.

Gonyeau had testified that while two of the party were assaulting him, the third seized hold of the prosecutrix and threw her upon the hard ground about the middle of the large entrance gate ; that the struggle between her and her asasilant continued about ten minutes, and was going on

when he ran for help; that they had got some five feet inside the gate during the strugle; that she was continually trying to get up and get away from him, one of them—he could not distinguish which—did get half way up and then fell upon the ground several times.  The prosecutrix testified that while two of the party were assaulting Gonyeau she was engaged in a violent struggle to resist the third and get away from him; that after Gonyeau left, all three seized her and finally outraged her, she all the time struggling and resisting with all her strength; that during the struggle she was twice thrown upon the ground.  She did not claim that there were any marks upon her person as the result of the struggle, except one upon her chest caused by a blow which the first assailant gave her when she tried to run away.  Dr. Peck examined her carefully two or three days afterwards, and found no bruises or marks upon her except the one upon her chest.

The charge upon this subject was not applicable to the evidence.  The jury might well have understood that they were at liberty to conjecture that the prosecutrix was so overcome with fright that she had so far lost her consciousness that she was unable to make resistance, which might account for the absence of bruises and marks upon her.  This was a state of facts not claimed by the prosecution.

*The exceptions are sustained in respect to these two errors in the charge, judgment reversed, verdict set aside and cause remanded for a new trial.*

Rowell, Munson and Start, JJ., concur.

Taft and Thompson, JJ., dissent.


TAFT, J., dissenting.  There was no error in the admission or rejection of evidence.  If there was a sound legal proposition in the requests it was complied with.  The exceptions taken to the charge as given upon the subjects of the requests, were general, pointed out no error, and our

authorities all agree should not avail the respondents. Had any of the errors now claimed been pointed out before the jury retired, they would have been corrected, undoubtedly, or the question been distinctly ruled upon.

THOMPSON, J., dissenting. There was no error in the admission or rejection of evidence. I cannot concur in the holding that the exceptions show error in the charge of the court upon the subject matter of the two requests to charge, quoted in the opinion of the majority. The respondents were not entitled to have the requests, as drawn, complied with. There was no error in what the court said on the subject matter of the requests. If it should have said more upon this phase of the case, there was no exception to the failure of the court to charge further. I also agree with Taft, J., that if there had been error the exceptions to the charge were too general to avail the respondents.